It's 5-14-349. There are some waivers in this and I don't understand how much time. I see 15 minutes is what you said, right? That's my understanding, yes. Good afternoon, Justices. May it please the Court.  I represent the Respondent of the Supreme Court. I'm here to speak on the case of the minor, Albert Smith. My brief basically covers a termination of parental rights. My brief covered a lot of topics. The only topic I'm going to cover today in the oral argument is the ineffective assistance and counsel. This matter involves a minor by the name of G.S. He was born November 22, 2011. He was immediately taken into custody at the hospital. He never was allowed to go home. The mother is Jessica Wooters.       He was a child of a woman. He was a child of a woman. He was a child of a woman. He was a child of a woman.     In the exception of his father, which violates the Grand Clause, there are no paternal rights for the mother. The reason for the violation was because the mother had a previous conviction for murdering her own child back in the 90s. Due to an athestic adjudication of warrants, it was filed the next day. It was a shelter care hearing held November 28, 2011. During that shelter care hearing, Wooders, the mother, admitted to turning off her insulin pump while she was pregnant with the child. December 17th … Is that the first time that came up? I mean, what you're saying is this issue of turning off the insulin pump and all that had nothing to do with the child being taken initially? I don't know that, Judge. Oh, okay. I'm not aware of that. I know they were watching her based off the previous conviction. Okay. December 7th, 2011, Steve Green enters his appearance for both the mother and the father. On March 1st, 2012, the people filed a motion to disqualify, and it's all done in open court. And the basis of their motion was that they recognized that you have one attorney representing the mother and the father with these adverse interests, and they believe there was a conflict of interest. Attorney Green conceded that point, and he went through from representing the mother, Wooders. However, he continued to represent the father throughout this whole time. On May 16th, 2012, an adjudicatory hearing was held, and Wooders admitted at that point that she had a previous conviction for murdering her own child. The child was then adjudicated and neglected. On November 1st, 2012, there was a dispositional hearing, and the child was made awarded to the court. The goal at that time was to return home within 12 months. However, 13 days later, at a permanency hearing, the goal was changed to substitute care pending termination of parental rights. And Attorney Green is representing Albert Smith the whole time, after representing Wooders at the same time. February 6th, 2013. Oh, and I must apologize, Justices. On March 1st, 2012, when Green withdrew from Wooders, my brief, I believe, says 2011, but that was actually 2012. I do apologize for that. February 6th, 2013, Attorney Green finally withdraws from representing Albert Smith. That date happens to be almost exactly 10 days short of the nine-month period following the adjudication. So basically, for the entire nine-month period, Albert Smith was represented by Steve Green. On February 21st, 2014, there was a fitness hearing, and Albert Smith was found unfit based on three things. First, his failure to make reasonable efforts to correct the conditions for removal within the first nine months. The second, his failure to make reasonable progress for the return of the child within the first nine months. And the last one, his failure to protect the child from conditions within his environment which are injurious to the child's welfare, specifically living with Wooders. I believe that last point has actually been conceded by the state in their required brief. There was then a best interest, and the parental rights of Albert Smith were terminated. Now, the Juvenile Court Act creates the right of any parent of a child that's alleged to be neglected or abused to be represented by counsel. And implicit within that right is that the counsel has to be effective, and it just makes sense. Otherwise, what's the point? And in determining whether or not counsel is effective, the courts and juvenile proceedings look to the criminal proceedings, and they use basically a mirror. And there's two different ways to see if counsel is effective. The first is whether or not there's a per se conflict, which is finding the people versus sprites, or whether or not the counsel is effective, pursuant to Strickland versus Washington. And under a per se conflict, it's very simple. If you represent one client, you can't represent another client if their interests are adverse. Or if you represent one client, and there's a former client, and their interests are still adverse, you can't represent them. And that comes from the fact that all clients have the right to undivided loyalty of their attorney. I think the quotation that's cited all the time is, no man can serve two masters. And it makes sense. And it's such a fundamental core to the client-attorney relationship that's actually found in the Rules of Professional Conduct. You have Rule 1.7, which deals with concurrent clients, and you have Rule 1.9, which deals with former clients. And because it's such a fundamental right, and it's such a fundamental portion of the client-attorney privilege, the courts, when they've done this, they've found that under a per se conflict, you don't have to show any prejudice whatsoever to have the case reversed. And that's been done in the juvenile courts as well. No prejudice is required. And it makes sense, because when analyzing all this, the courts have determined there's really no way to show, or very difficult to show, how many subtle or subliminal effects would be the conflict might have on them. They just can't figure it out, but they know something's going to cause it to affect the representation. They've also said it doesn't matter if the attorney represented with confidence and dedication. They also don't care how long the representation was for. All you have to have is a conflict prevention adverse position. And that's exactly what we have here, because the sole reason that the child was taken was the actions of the mother, both in turning the insulin pump off, and as well as the previous murder of her child. Albert Smith did nothing wrong. He couldn't have done anything wrong. He never even had custody of the child. The child was taken immediately. So they're clearly adverse. It's almost analogous to criminal defendants. You have co-defendants. They all want the same thing. They all want their case dismissed. Albert and Wooter is one of the child bank. But they all want the same thing. But if you have a criminal defendant saying, I didn't do it. That guy did it. And he's a co-defendant. You can't have the same attorney represent. It's very, very basic. So Green represents both of those, two of them, in the beginning. And he makes at least three court appearances for both. He also represents Albert for almost the entire nine months of the first nine months following adjudication. There's no real way to know what effects it had on Albert's representation. But he doesn't have to show it under a per se conflict. It's automatic. It also doesn't matter whether or not he's hired as opposed to appointed. The rules of professional conduct are clear. They don't differentiate between them. There is a per se conflict. The second way you can find ineffective assistance counsel is under Washington v. Strickland. And that's a two-parter. It requires, number one, that representation fell below the objective standard of reasonableness. Or number two, there's a reasonable probability the outcome would have been different if it had not been for the ineffective assistance of counsel. The first one is very simple. The objective standard of reasonableness, you just look at the rules of professional conduct to determine that one. Rule 1.7 says you can't have a client represent another client if their interests are reversed. Same thing with the former clients. You can't represent a client against a former client if their interests are reversed. And it's basically the same incident. In this case, it's exactly the same incident. Or you can't represent a client if that would materially limit your ability to represent another client. So in this particular one, it's clearly adverse. Albert is required to put all the blame on Wooders and distance himself from her. Otherwise, he can't get his kid back. It's kind of a no-brainer. In fact, it's so great, such great adversity, that the people who file a motion disqualify, which Greenlander concedes halfway. Counsel, on the record, was there a waiver? Did the father, was there anything that showed that he was explaining this by the attorney and that he was aware of the potential conflict and waived that conflict? No, Your Honor, it's not. And the rules do allow for a waiver on informed consent only. The only admonition ever given was when there was a motion to disqualify. The judge in that particular matter admonished Wooders about, and basically there were words where he may say one thing and you may say another, and there's a conflict of interest. But he never, she never said it to Albert Smith. And at the same time, Albert Smith's conflict is a little bit more complicated than that. So he never was explaining it. And if you think about common sense and human nature, would you consent to an attorney representing you and the mother knowing that you're probably going to lose your child over all this? I think a reasonable person would have said, I'm not so sure I would have consented to this. But the court never did that, and I believe the court did have a duty to do that, but they never did. And Attorney Green does try to cure this by withdrawing from Wooders. However, if you look at Rule 1.7 under the Committee Note No. 29, it clearly says normally the attorney has to withdraw from both parties rather than just one. And I do apologize. I believe I cited that as Rule 1.6 in my brief, but it actually is 1.7. So there's no question that he fell below the objective standard of reasonableness. The next question is, is there a reasonable probability that the outcome would have been different? It's absolutely undisputed that Green had advised Albert not to complete an integrated assessment. That's testified by Green, but that's also testified by the caseworkers, as well as in the caseworker's notes. And was that at the adjudicatory hearing, or where did that testimony come out? That was at the unfitness hearing. It also falls on some of the caseworkers, the permanency reports that are provided to the court. So there's no question that Green had told Albert not to complete this assessment without the assessment, there's no service plan. Without the service plan, there's no recommendation of services that he can do, and therefore, he can do absolutely nothing to get his child back because it's basically stalled once you've gone through the integrated assessment. It's the first step. If you look at the timeframe from the time that Green had started representing Albert up until the time that Albert finally said, I will do the integrated assessment, we don't know if that's because Albert said, I'll just do it, or if Green finally told him. But at the very least, it's a minimum of a delay of six months in completing the assessment. Minimum. Once that's done, there's still even more delay. Some of that is attributable to the agency, though, and I think that came out in the testimony there was canceled appointments. So when Albert finally is able to complete the assessment, he has four months to complete all the services within the first nine months. Now, take into account anybody who's dealt with any juvenile cases or any other cases involving counseling, it's very difficult to get some of these services anymore due to budget cuts, and there's always a waiting list. So at the very minimum, Albert, for almost the entire nine months while he's represented by Attorney Green, he's not able to complete all this stuff, and that was basically what the court found, that, hey, you didn't do it within the first nine months. They didn't look at the nine months after that. How else can you tell that it would make a difference if he didn't have Attorney Green? Albert Smith is given Attorney Tom Moyer right after, I think like a week or two after the nine-month period, and he immediately begins to do all the services. He immediately makes a change. So I think, Your Honors, there is a per se conflict. Albert Smith does not have to show any kind of prejudice, and even if he is required to show prejudice under Washington v. Strickland, I believe it's Strickland v. Washington. I think I have it backwards, actually. He does show. He does meet those standards. He shows that the representation fell below an objective standard, and he shows that the outcome would have been different. Now, of course, the big question is what's the remedy? What's the remedy? The remedy in a criminal case is easy. You just get a new trial. That doesn't work here because in a trial you're not being tried for the time period from after the crime up until the time of your trial. Here it is. That's exactly what he's looking at. From the time the incident of the trial was taken up until the time of the unfitness hearing, that's what you're being tried for, that same exact time period that this conflicted attorney was representing him. Because of that, the only fair and just remedy in this particular matter would be you can't include the time period that he was represented by Green. And I understand that sounds kind of harsh, but whose fault was it? It wasn't Albert's fault. He got an attorney because he needed one. And the state recognized there was a problem, but the state didn't follow through because they only allowed him to withdraw from one. At the same time, the court had a duty to find out if there was employment consent, and they did not do that. So that's the only adequate remedy. But at the very least, the termination needs to be reversed. Thank you. Is there an explanation anywhere in the record as to why Attorney Green advised him to not go through the intake? Is there a trial strategy rationale there somewhere? I'm not 100% sure, Your Honor, and you understand I wasn't involved in that as well. The only thing I got out of it was that possibly he didn't believe the person that was giving the assessment was actually qualified. But he never made any attempts to correct that. And I believe at one point he was told, yes, they are qualified because I think they've got somebody from SIU that would do it. But at that point, he was still advising. Thank you. Thank you, Your Honor. I don't think there's any other advice I need to use. The next case is Poole v. Zip, 5-13-406. Good afternoon, Your Honor. May it please the Court, Mr. Montes. This is an appeal by the state from a ruling of a certain court in St. Clair County in a murder trial, a murder case. Excluding or suppressing, depending on how you want to look at it. A certain statement was made by the defendant during a telephone conversation, the conversations that he had with his mother and girlfriend. These conversations occurred in an interrogation room at the Belleville Police Department in a room that was under audio and video recording surveillance. Before I get to the core constitutional issue here, I do want to talk a little bit about jurisdiction. The defendant raises a jurisdictional challenge and his answer brief. Of course, this court has an independent obligation to determine its own jurisdiction, so I want to touch upon that briefly at the beginning. The crux of the defendant's argument in this regard, is that there's not really anything that's been excluded in this case, and thus there's nothing under Rule 604A for the state to appeal, because there's an alternate means in which the state could present the evidence that was subject to the exclusion by the court in this case. The defendant cites cases from the Supreme Court, where the state had appealed from orders which had, certain court orders which had excluded, in one instance was a crime record, and the court had ordered the state to actually produce live testimony. And the Supreme Court says, well, we don't have jurisdiction, because there's not really an appealable order, because the state had a way to present the exact same evidence, it just had to do so through live testimony rather than through the certificate of the crime record. It's an interesting argument, but I don't think that it really works in this case. The reason for that is that there is no exact substitute for the type of evidence that the state is seeking to appeal in this case. The defendant's argument sort of takes kind of two folds. Number one, it was one where the state could present the testimony of the people to whom the defendant called, and present their testimony instead. Or alternatively, the defendant had actually confessed earlier in the case during the interrogation. And so that would supply sort of like the same kind of evidence that these other states would make. Two points to be made in that regard. Number one, it's not the same evidence to say that there is obviously a visceral effect to seeing the recording of the defendant from his own lips, say these things emotionally, verbally, the context of it is a lot different than two witnesses who would arguably be very friendly to the defendant asking them to relay admissible hearsay. With regards to the defendant's confession, again, while it's certainly obviously good evidence, it is similar to, it's not the same. So I believe that the state would submit that this court does have jurisdiction to consider this state appeal. It's a particular individualized set of evidence that can't be duplicated by any other means, unlike the cases cited by the defendant. Having got to that, the case is really kind of a straightforward Fourth Amendment case. It wasn't always that way. In the initial incarnation of this case, the defendant had argued and raised the issue that this felony should be excluded under a normalized eavesdropping statute. To be perfectly frank with you, that's probably not a bad argument. A normalized eavesdropping statute at the time was two-party consent. Clearly, the state was not going to be able to approve two-party consent for these telephone conversations. So at that point, that was where it all started, where it ended up, perhaps pressingly by the circuit court judge. Ultimately, it was actually a right to privacy Fourth Amendment type of issue. That came about actually after this case went up on appeal, when the only Supreme Court struck down the eavesdropping statute in its current form, when people v. Clark. What that did, in effect, really was do away with the two-party consent and the legislative abrogation of the right to privacy, which had been written into the statute. The defendant makes an argument, which I think is an interesting one, and maybe not the wrong one, that any time you have a statute that's declared unconstitutional, it reverts to its prior format. But I don't think that it really changes the substance of this case for the appeal. It's still going to come down to the expectation of privacy and the Fourth Amendment. That's just sort of how the eavesdropping statute was originally written. And there's language in the Clark opinion which supports that proposition, that the right to privacy is sort of the core ingredients of eavesdropping, going back to the Commonwealth notions of hiding under the eaves to overhear a conversation. This trial court here made a factual finding that he had an expectation of privacy. That's correct. And it was reasonable. That's correct. And what's our standard of review on that factual finding? Standard of review would be de novo, and the reason for that, de novo. On the factual finding? Yes, because it's not contested what the facts are. There's a recording of everything, so, I mean, there's not much to do. Isn't the trial court drawing some inferences here, though, about the nature of the conversation? He said, I want privacy. You know, the police officer said, yeah, and left the room. We know what happened, but in order to reach the determination that, factually, the defendant in this case expected to get privacy from that conversation, doesn't the trial court have to draw some inferences? I think that that's not incorrect. In fact, it's sort of an inferential step in this case. In a way, it makes the case a little bit harder from a defense perspective and easier. I mean, this is an important issue, I think, because generally on a motion to suppress or exclude or whatever you want to call it, the trial court's factual findings are first determined under the manifest way to the evidence standard, but then the court makes a de novo decision about whether or not under those facts found by the trial court, suppression was appropriate. I think that that's a fair statement. I mean, the reason we set forward de novo is largely because of the fact that the actual facts, absentee inferences, of course, are under the contest. When we talk about inferences, you have to understand that the inferential nature of the case stems largely from the fact that the defendant didn't testify. And so, you know, the defendant makes, I think, the correct argument that one of the ingredients, if you will, of the expectation of privacy is a subjective expectation of privacy. We don't have that in its prior procurious form, which would be the defendant said, this is what I thought was going on. This is what I thought was going to happen to me. So in a way, I characterize it in a reply brief that most of the defendant's arguments are inferential, much as the circuit court's, because it sort of drew conclusions, I think, probably not supported necessarily overtly by the record. So that's sort of why I say, yes, but, you know, you've got an instance where those inferences don't necessarily apply to support the circuit court's decision. Or, you know, it's questionable how much deference should be paid to them, given the fact that their inference is drawn sort of from the court's subjective interpretation rather than based upon the record. So there are... From watching the video, I guess, as well. Well, from watching the video, yes. The inference actually, let's just go ahead and talk about this right now. Since the inference, I think, stems largely from particular verbiage used at the time of the interrogation. Specifically, what had happened was, during the course of these three interrogations, there was only one issue here. During the course of those interrogations, the defendant had been admonished a number of times. If you're in a room, you've recorded audio, you've recorded video. At one point, the defendant says, I'd like to make a couple of phone calls. And the police say, well, we'll get back to that in a minute. And then a little bit later on is where we get to the important point. He says, hey, can I have a little privacy to make those phone calls? The officer says, and you'll see the video of it, yeah, we'll get to that. And so, you know, how long it means yes, you get privacy, or yeah, we'll get to that, or yeah, we'll talk about that later, or yeah, you get to make phone calls. I mean, there's a lot of things that could mean. The circuit court said, yeah, it means you get privacy. Of course, when you start making those quantum leaps, the court's order makes sense at the end, but those are also quantum leaps that the court's undertaking. Well, the officers left the room. And gave him the telephone. And had him bring the telephone, you know, which would seem to be acquiescing in his request for privacy. All right. We'll grant that. I mean, that's not an unreasonable inference. It's not an unreasonable inference, but let's grant that particular point. And then ask ourselves, okay, what does privacy mean when we talk about the subject of more and more and more reasonable societal understanding of privacy? I want to make a point here real quick. When you look at the defendant's initial motion, it says that things happen, and then the officers give the defendant some privacy, and they leave him in the room and leave him home. If you look at Judge Barrett-Civic's order, he makes sort of the same comment. He has granted some privacy when made to make the phone calls. Those are not inconsequential slips. Those are, perhaps go right to sort of the point I've been trying to make, is that there's a difference between privacy, which we understand, if I may just finish this sentence, because we understand in the Fourth Amendment, that privacy, as laypeople may understand, where you don't want someone hovering over you while you make phone calls. So that's the point. That's it. Thank you. May it please the Court. Counsel. Alexander Munches from the State Appellate Defender Office, representing Kenneth Colsey. Your Honors, as the State discussed for several issues in this appeal, I'd like to briefly touch on the jurisdiction issue, and spend most of my time on the Fourth Amendment issue. The only thing I'd like to say about the jurisdiction issue is that the rule in this area is clear. When considering the propriety of an appeal brought under Rule 604A, it focuses on the effect of the suppression order and not on the nature of the evidence involved. The State's affirmative argument for why this Court has jurisdiction is that this particular evidence has a visceral effect. Your Honor, I respectfully submit that that is an argument about the nature of the evidence involved, not about the effect of the suppression order. Moving on to the Fourth Amendment. This is a case about whether the State may use your words against you when you've explicitly asked for and received privacy. Over a 40-hour period, Mr. Zook was arrested and interrogated three times. He confessed to shaking A.F. during the third interrogation. He knew that he was being recorded. Before placing phone calls to speak with his family and a loved one, he explicitly asked for privacy. In response, his interrogating officer said, yeah. But after the officers ended the interrogation, picked up their materials, and left the room, the camera continued to record him as he placed his private phone calls. Your Honor, does the trial court order barring the use of this part of the recording should be affirmed? In affirming this Court, we'll do two things. First, we'll give due deference to the trial court's capital finding. In particular, that Mr. Zook demonstrated subjective expectation of privacy by explicitly asking for and apparently receiving privacy before placing his phone calls. Second, this Court will uphold the trial court's sound legal conclusion. The society would recognize as reasonable the interrogating officer's choice to grant Mr. Zook privacy, a choice which gave rise to a humane moment at the end of a 40-hour period. The trial court correctly found that Mr. Zook demonstrated subjective expectation of privacy. As it succinctly stated, Mr. Zook knew that the police were listening while he was asked for privacy. On appeal, the State has not overcome its burden and has not shown that the trial court's order was clearly erroneous. Mr. Zook's explicit request for and apparent receipt of privacy demonstrated subjective expectation despite his custodial setting. In short, privacy means privacy. The trial court correctly inferred that Mr. Zook used privacy in the plain, ordinary, and popular sense. The sense of the word is that privacy is a statement being apart from the company or observation of other seclusion. That's the definition I take from the Illinois Supreme Court in Swiderski. In that case, the court said, this contract doesn't define privacy. What does privacy mean? Let's look to the dictionary. This is a far different definition than the State offers. I suggest that this is the superior one. Now, Detective Isken's admonition to Mr. Zook that the room was audio-video recorded spurred Mr. Zook to explicitly ask for privacy before placing his calls. As the State mentioned, Mr. Zook had asked to make calls previously. At this point, the second time he asked to make calls, he asked for privacy. He knew what was going on, and he wanted privacy. Detective Krause's affirmative grant of privacy, the word yeah, led Mr. Zook to believe he had made private phone calls. The detectives announced the end of the interrogation. They picked up the materials, left the room, and pulled the door behind them. The trial court's factual finding of subjective expectation of privacy was in accord with the manifest way of evidence. Secondly, the trial court soundly concluded that Mr. Zook had a reasonable expectation of privacy. The test is not whether Mr. Zook chose to conceal his activity. Instead, it's whether the government's intrusion infringes upon personal and societal values protected by the Fourth Amendment. This ultimate question is a value judgment. Here, the trial court soundly concluded that society is willing to recognize as reasonable interrogating officers' choice to grant a suspect privacy. Indeed, the trial court commended the officer's actions. It said, I commend the officers involved. The officer could have, if they wanted to listen, said so. They could have said no. They could have said nothing. But the officer said yes. After the end of the third interrogation of a 40-hour period, Mr. Zook had confessed to shaking AF and also demonstrated how he shook AF on a mannequin. Only at the end of the interrogation, after the confession, after the demonstration, was he allowed to speak and seek private consolation from family and a loved one. Accordingly, society would recognize as reasonable the interrogating officer's choice to grant Mr. Zook privacy. I want to make a separate note. In the state's reply brief, they cite prison and jail cases for why it would be unreasonable to grant a suspect privacy. The rationale of those cases is security. On the record, there's no evidence that it's a police department policy for security. There's no record that the statutory policy behind filming interrogations for these types of crimes has to do with security. In fact, there's the opposite implication on the record. In the first interrogation, it ends abruptly, mid-call with Mr. Zook on the phone with his mother. If security was at issue, you would think that that first interrogation would record the entire conversation. It doesn't. In sum, the state may not use your words against you when you have explicitly asked for and received privacy. Privacy means privacy. In addition, society recognizes as reasonable the interrogating officer's choice to grant Mr. Zook privacy. Accordingly, this court should affirm the trial court order barring the use of this recording. There are no questions? No questions. Thank you. Just so we're clear here, when I mentioned this jail case, I do also make it explicit in the requirement that we're not saying this is like those cases, exactly factual. The point I was attempting to make was that there are expectations of privacy that we understand in the home or in the phone booth, like the Katz case, things of that nature in a trial. And then at the other end of the spectrum, there's that lowest level of expectation of privacy in the jail. This is sort of in the radar. It doesn't, obviously, it's not exactly per se the jail cases, but the defendant is in an interrogation room, confessed to at least manslaughter, perhaps murder. And he's obviously not free to leave, so if he's not in jail, he's certainly not sitting in the comfort of his home watching TV while there's a recording of my son listening to him. And I think it all sort of plays into the second aspect of the Katz analysis of what society is willing to consider  So just so that, I just want to make that clear that I wasn't making that point, that they are the same. Again, when we talk about subjective expectation of privacy, you know, I don't want to belabor this point anymore than perhaps I already have. I just do want to emphasize the fact that the subjectiveness comes from a particular sort of deficit of information rather than an abundance of it. It is the defendant's burden to establish the Fourth Amendment violation, not the state's, to counter inferential notions of it. So, you know, when I make the point to the court that, well, we talk about privacy, and there's privacy sort of being projected in the sense that we don't want, oh, you want us to leave the room, you want to make a phone call. Again, there's nothing on the record to show that the defendant believed or asked or was under any impression at all that that particular use of the word, which, as I've already demonstrated in the pleadings of the parties in the court, means get out of the room while I make a call so you don't have to watch me weep on the phone while I talk to my mother and my girlfriend. There's nothing to indicate that there was, I mean, again, we're talking about a room that's under constant recording. It's not a tape recorder placed in front of the defendant that you press play or stop. You know, it may have been made clear, I don't really know the way, I think from the objective standpoint, that the individual will think that anything has changed other than the fact that the officer has left the room. If the defendant had some alternate idea of things, they're left unspoken at this point. From the societal standpoint, again, I've discussed how that kind of ties into what I just said about the particular milieu in which these interrogations are taking place. Conversations are made. He's in the same room. None of the circumstances have changed. And I believe that when it comes right down to it, the court found privacy to be rather broadly drawn under the various sub-circumstances that would provide factual support. Privacy was the magic word. And so the court's, and so the officer's sort of noncommittal yes to that, and then leaving the room, establishes only that. And it doesn't establish that there was any other violation of the defendant's privacy rights beyond that. It's certainly no argument to me that they did so intentionally. This recording is going on and on and on and on. So, it's our position now, the state's position, that when you examine this under the Fourth Amendment aspect now, that the defendant did not have any expectation of privacy as delineated in the enhanced test. And we would ask this court to reverse the judgment of the circuit court and remain in its concept. Thank you. Thank you, counsel. In case you want to take another advisement, we will be notified of due course next Tuesday. And the court will remain in recess until December.